MICHIGAN TRANSPORTATION COMPANY v SECRETARY OF STATE

1. CONSTITUTIONAL LAW—CONTRACTS—RETROACTIVE STATUTES.

Generally, a statute cannot be retroactively applied so as to change the substance of a contract previously entered into.

2. CONSTITUTIONAL LAW—CONTRACTS—RESTRICTIONS.

Freedom of contract is a qualified and not an absolute right and does not deny the government the power to provide restrictive safeguards imposed in the interests of the community.

3. STATUTES—CONSTRUCTION OF AMENDMENTS—PRESUMPTIONS.

An amendment to a statute, which deletes phraseology from the act that allowed contracting parties in certain rental contracts to contravene the provisions of the act by written agreement, raises a presumption that a change in meaning was also intended, and that contracts in contravention of the act are no longer permissible (MCLA 257.801[k]).

4. STATUTES—REASONABLENESS—PRESUMPTIONS.

There is a presumption of validity of a legislative classification, and the person assailing the statute has the burden to show that the legislative action is arbitrary.

5. STATUTES—AMENDMENTS—DECLARATION OF PURPOSE.

A state legislature need not explicitly declare its purpose in adopting a statute or amendment.

6. CONSTITUTIONAL LAW—STATUTES—IMPAIRMENT OF CONTRACTUAL OBLIGATIONS—MOTOR VEHICLES—REGISTRATION FEES.

A state has the authority to adopt a statutory amendment which

REFERENCES FOR POINTS IN HEADNOTES

[1, 6] 16 Am Jur 2d, Constitutional Law §§ 444–448.
   17 Am Jur 2d, Contracts § 171.
[2] 16 Am Jur 2d, Constitutional Law §§ 373–378.
[3] 50 Am Jur, Statutes §§ 217–429, 468.
[4] 16 Am Jur 2d, Constitutional Law §§ 137, 144.
[5] 16 Am Jur 2d, Constitutional Law §§ 150, 151.
[7, 8] 16 Am Jur 2d, Constitutional Law §§ 204–209.
[8] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 50, 51, 69.

impairs an obligation of certain rental contracts between private parties, by shifting the burden of payment of motor vehicle registration fees, where the impact of the amendment on the main thrust of the contract is slight and the state interest in adopting the amendment is significant.

7. CONSTITUTIONAL LAW—STATUTES—NATIONAL LABOR RELATIONS ACT —PRE-EMPTION.

The Court of Appeals will not infer in the absence of compelling congressional direction that the National Labor Relations Act has pre-empted a state's power to regulate conduct which touches interests deeply rooted in local feeling and responsibility.

8. CONSTITUTIONAL LAW—PRE-EMPTION—MOTOR VEHICLES—REGISTRATION FEES.

A state statute requiring apportionment of payment of a motor vehicle registration fee between the owner and a lessee of such vehicle is a proper exercise of police power and as such does not fall within the area of state commercial regulation preempted by Federal law.

Appeal from Ingham, Donald L. Reisig, J. Submitted Division 2 November 2, 1971, at Lansing. (Docket No. 9790.) Decided July 3, 1972. Leave to appeal denied, 389 Mich 767.

Complaint by Michigan Transportation Company and others against James M. Hare, Secretary of State, Keith H. Livsei, and others for declaratory judgment to determine their rights and duties concerning license fee provisions of the Michigan Vehicle Code. Judgment for plaintiffs. Defendants Livsei and others appeal. Remanded with instructions.

*Sullivan & Leavitt,* for plaintiffs.

*Goldberg, Previant & Uelmen* (by *John S. Williamson, Jr.) (Paul C. Younger* and *James P. Hoffa,* of counsel), for defendants Keith H. Livsei and others.

Before: DANHOF, P. J., and BRONSON and TAR-
GONSKI,* JJ.

TARGONSKI, J. Plaintiffs filed suit on August 21,
1969, seeking a declaratory judgment[1] and con-
junctional injunctive relief with respect to their
rights and duties concerning § 801(k) of Chapter
VII of the Michigan Vehicle Code as amended by
1969 PA 309, effective immediately. MCLA
257.801(k); MSA 9.2501(k). The trial was on De-
cember 22, 1969, and the circuit court opinion filed
February 24, 1970, construed § 801(k) favorably to
plaintiffs and denied the injunction since the deci-
sion rendered it unnecessary.[2] Defendants-appel-
lants filed a motion for reconsideration on March
6, 1970. After a June 12, 1970 hearing thereon, the
motion was denied on June 24, 1970, except that
the court limited the judgment to include only a
narrow class of defendants. This appeal is pre-
sented as of right.

Plaintiffs are all Michigan motor carriers in-
volved in the interstate shipment of goods. Defend-
ants-appellants each own and lease motor vehicles
to plaintiffs, which motor vehicles are driven by
defendants-appellants, hereinafter known as
"owner-operators". Contracts between plaintiffs
and the owner-operators are national in scope,
pursuant to the National Labor Relations Act, 49
Stat 449 (1935); 29 USCA 151 *et seq.,* as amended
by the Labor Management Relations Act, 61 Stat
136 (1947); 29 USCA 141 *et seq.* Contracts are
negotiated through collective bargaining proce-

---

* Former circuit judge, sitting on the Court of Appeals by assign-
ment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] GCR 1963, 521.

[2] The trial court upheld the constitutionality of this section of the
statute and found that it did not impair the obligations of existing
contracts or impair the right to contract.

dures, the owner-operators being represented by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Basic wage scales for the employment services of owner-operators leased by plaintiffs and minimum rental fees are included terms of the collective bargaining agreement.

In 1967, § 801(k) of the Michigan Vehicle Code was amended to increase the registration fee taxable against all owners (including the owner-operators herein) of motor vehicles, which section reads in part:

"Where a truck or road tractor without trailer is leased from an individual owner-operator, the lessee, whether person, firm or corporation, shall pay to the owner-operator 60% of the fee prescribed in this subdivision for the truck-tractor or road tractor at the rate of 1/12 for each month of the lease or arrangement in addition to the compensation the owner-operator is entitled to for the rental of his equipment, *except where the same has been otherwise agreed to by the owner-operator and the lessee in writing.*" MCLA 257.801(k); MSA 9.2501(k) (Emphasis added.)[3]

Then, in 1969, the Teamsters lobbied successfully for an amendment to the above Michigan statute whereby the italicized clause in § 801(k) was deleted, to read as follows:

"Where a truck or road tractor without trailer is leased from an individual owner-operator, the lessee, whether person, firm or corporation, shall pay to the owner-operator 60% of the fee prescribed in this subdi-

[3] The owner-operators allege in their appellate brief that prior to 1967 the burden of paying the registration fee fell upon the carrier (plaintiffs), but that under the above-quoted amendment an owner-operator could pay up to $980 maximum fee on his equipment, *if he agreed in writing.* Thus, the payment of said fee appears to be a proper subject for collective bargaining between the carriers and owner-operators.

vision for the truck-tractor or road tractor at the rate of 1/12 for each month of the lease or arrangement in addition to the compensation the owner-operator is entitled to for the rental of his equipment." MCLA 257.801(k); MSA 9.2501(k).

On account of this 1969 amendment, plaintiffs feared that said deletion signified that the collective bargaining agreement, in effect at the time of this amendment, which provided that the owner-operator shall pay the license fee, would no longer control the apportionment of the payment of the registration fee as between carriers and owner-operators, and filed this suit.

As previously mentioned, the trial court filed an opinion on February 24, 1970, in which Ingham County Circuit Judge Donald Reisig held, in pertinent part as follows:

"Thus this court finds that the section in question as amended by Act § 309, 1969, is constitutional and further that it can be interpreted so as to neither impair the obligation of existing contracts nor enter an area heretofore preempted by the federal government. That is, this court holds *the amended section does not prohibit the enforcement of contracts which provide for some other provision for the payment by the lessee to the owner-operator of the 60% of the fee prescribed in the subdivision,* nor does it prohibit future contracts to the same effect. However, where the contract is silent, i.e., where there has been no agreement between the owner-operator and the lessee in writing with reference to the fee, the statute is enforceable, valid and constitutional. Such interpretation gives full effect to both the 1967 Act and the 1969 amendment without requiring that the court write the stricken provision back into the statute or requiring the court to invalidate the entire provision."

The owner-operators now appeal from the above lower-court decision, alleging that the 1969 amend-

ment of MCLA 257.801(k); MSA 9.2501(k) prohibits and precludes any other arrangement for the payment of these fees except in the manner found in the statute.

I. *If the 1969 amendment deleting certain language from § 801(k) of the Michigan Vehicle Code was intended to prohibit carriers and owner-operators from contracting to alter the statutory apportionment of the registration fee, does such a construction of the amended section amount to an unconstitutional law impairing the rights and obligations of private contracts?*

Plaintiffs assumed that the effect of the 1969 amendment deleting the language "except where the same has been otherwise agreed to by the owner-operator and the lessee in writing" was to prohibit a collective bargaining agreement between carriers and owner-operators altering the 60-40 fee payment ratio established in the statute. Plaintiffs brought this suit seeking a declaration that carriers and owner-operators are not prohibited from agreeing to alter the ratio. The trial court apparently assumed that if the amended statute were construed to prohibit such an agreement, § 801(k) would then be rendered unconstitutional. But the trial court opinion never reaches this issue.

Plaintiffs' basic contention is that the aforesaid construction of the amended statute would amount to a violation of due process in that plaintiffs are denied their right to enter into private contracts and are thus deprived of property without due process of law, there being no public purpose upon which to rest this exercise of police power. The owner-operators reason to the contrary, alleging

that strict interpretation of the 60-40 fee payment ratio is mandatory. Further, the owner-operators allege that such a construction of the amended statute, prohibiting contracting otherwise, does not amount to an unconstitutional law impairing the rights and obligations of private contracts.[4]

The basis for plaintiffs' reliance upon their "right to enter into private contract" is obviously the constitutional provision barring any state from passing a law impairing the obligations of contracts.

"No state shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility." US Const, art I, § 10.

"No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted." Const 1963, art 1, § 10.

Plaintiffs, as carriers, and the owner-operators were signatories to the National Master Freight Agreement and National Iron and Steel and Special Commodity Supplementary Agreement which covered the period from April 1, 1967, through March 31, 1970, and contained the following language in article 59, § 10:

"It is expressly understood that the owner-driver shall pay the license fee in the state in which title is registered."

This collective bargaining agreement, or private

---

[4] Neither party questions the constitutionality of the imposition of the tax upon the equipment nor the constitutionality of the apportionment of the tax between the owner-operator and the lessees.

contract, placed the burden upon the owner-opera-
tors to pay the registration fee.

If the 1969 amendment is given the construction
assumed under the heading of this issue, it ap-
pears that the most the Legislature could decree is
a prospective, and not a retroactive, effect. The
controlling case on this general principle is *Guard-
ian Depositors Corp v Brown,* 290 Mich 433, 439
(1939):

"We are here faced squarely with the question of
whether the act may be applied to contracts created
before it went into effect * * * . The trial court found
that a new and substantial right was created by the
statute, rather than a mere additional remedy, and for
this reason held that to apply it to the assumption
agreement made between defendants and the Treveth-
ans would impair the obligations of the contract and
violate due process in contravention of both State and
Federal Constitutions.

"Admittedly, a statute cannot be retroactive so as to
change the substance of a contract previously entered
into."

See, further, *Schoolcraft Community School Dis-
trict No 50 v Burson,* 357 Mich 682, 688 (1959).

The amendment went into effect August 19,
1969. The above-cited authority, based upon article
1, § 10, of both the Federal and State Constitu-
tions, prevents a retroactive apportionment of reg-
istration fee payments. However, the status of the
carriers and owner-operators' obligation under the
amended statute and the balance of the collective
bargaining agreement[5] and, thereafter, any subse-
quent contract, rests upon different footing. The
general principles applied in *Guardian Depositors
Corp v Brown, supra,* are not absolute and always
controlling. Situations and circumstances may ex-

[5] Through March 31, 1970.

ist where the right to enter into contracts may be regulated by the State under the police power. Discussion of this power in relation to the right to contract is found in *West Coast Hotel Co v Parrish,* 300 US 379; 57 S Ct 578; 81 L Ed 703 (1937), wherein the constitutional validity of a state minimum wage law was upheld.

In the *West Coast Hotel* case, the precise constitutional provision involved was the same as plaintiffs invoke in the instant case, the due process clause of the Fourteenth Amendment. As Chief Justice Charles Evans Hughes points out, said amendment is the basis for any alleged "freedom of contract".

"In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

"This essential limitation of liberty in general governs freedom of contract in particular.

\* \* \*

" 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the

making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' *Chicago, B & Q R Co v McGuire,* 219 US 549, 567 [31 S Ct 259, 262; 55 L Ed 328, 338 (1911)]." 300 US at 391–392; 57 S Ct at 581–582; 81 L Ed at 708–709.

This line of thought has continued to exist and continued to play a role in our judicial system. In *El Paso v Simmons,* 379 US 497; 85 S Ct 577; 13 L Ed 2d 446 (1965), challenged statutory amendments permitted forfeiture of public land if the purchaser failed to make the required interest payments within a five year period from the date of default. Prior to these amendments, the purchaser who had failed to pay the interest due had a right to have his claim reinstated at any time provided no third party interest had intervened. In holding that the amendment did not unconstitutionally impair the obligations of contract, the Court said:

"For it is not every modification of a contractual promise that impairs the obligation of contract under federal law, no more than it is every alteration of existing remedies that violates the Contract Clause.

\* \* \*

"[T]he principles underlying the application of the Contract Clause, makes it quite clear that '[n]ot only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect". *Stephenson v Binford,* 287 US 251, 276 [53 S Ct 181, 189; 77 L Ed 288, 301; 87 ALR 721 (1932)]. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation

of essential attributes of sovereign power is also read into contracts as a postulate of the legal order * * * . This principle of harmonizing the constitutional prohibition with the necessary residuum of state power had had progressive recognition in the decisions of this Court.' *[Home Building & Loan Ass'n v Blaisdell,* 290 US 398, 434–435; 54 S Ct 231, 238–239; 78 L Ed 413, 426–427; 88 ALR 1481 (1934)]. Moreover, the 'economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.' Id., at 437 [54 S Ct at 239; 78 L Ed at 428]. The State has the 'sovereign right * * * to protect the * * * general welfare of the people * * * . Once we are in this domain of the reserve power of a State we must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary.' "

*     *     *

"Of course, the power of a state to modify or affect the obligation of contract is not without limit. '[W]hatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other.' " 379 US at 506–509; 85 S Ct at 582–584; 13 L Ed 2d at 453–455.

Returning now to the facts in the instant case, we find ourselves faced with the task of determining whether the Legislature has overstepped its bounds, as enunciated in the above two cases; or whether the enactment of the 1969 amendment to MCLA 257.801(k); MSA 9.2501(k) had justifiably impaired the parties' existing contract and right to contract pursuant to the state's police power. We are put to this task, of determining the constitutionality or unconstitutionality of MCLA 257.801(k), *supra,* on account of our difference of opinion with the lower court reasoning. The lower

court felt that "where a section of a statute is amended, the original ceases to exist and the section as amended supersedes it and becomes a part of the statute for all intents and purposes as if the amendments had always been there", citing *Rookledge v Garwood,* 340 Mich 444 (1954); *Detroit Club v Michigan,* 309 Mich 721 (1944). From this, the lower court reasoned that the 1969 amendment to MCLA 257.801(k), *supra,* did not prohibit the enforcement of contracts which provide for some other provision for the payment by the carrier to the owner-operator of the 60% of the fee nor did it prohibit future contracts to the same effect.[6] We disagree. We feel that the better policy is that in construing an amendment to a statute a court should ascertain and give effect to the intention of the Legislature and in doing so a change in phraseology from that of the act as it stood before amendment raises a presumption that a change of meaning was also intended. *Lawrence Baking Co v Unemployment Compensation Commission,* 308 Mich 198 (1944); *Bonifas-Gorman Lumber Co v Unemployment Compensation Commission,* 313 Mich 363 (1946). Applying this reasoning, we can only find that the Legislature intended, through the enactment of the 1969 amendment to MCLA 257.801(k), *supra,* that its authority to apportion the registration fee could not be limited by private contract.

Having determined the effect of MCLA 257.801(k); MSA 9.2501(k) as it presently reads, we must now return and determine whether the wel-

---

[6] The trial court seemed to have interpreted the amended statute as such because of its apparent fear that if the amended statute was construed to prohibit the contract involved here between the parties, MCLA 257.801(k); MSA 9.2501(k) would be rendered unconstitutional and in that case, the lower court felt that where possible to do so, courts should construe statutes in such a manner as to render them constitutional rather than unconstitutional.

fare and interest of the state was so substantial as to justify the enactment of the above legislation notwithstanding an interference with contracts. In other words, we must pass upon the reasonableness of the statutory regulation. See *Grocers Dairy Co v Department of Agriculture Director,* 377 Mich 71 (1966). And in doing so, the applicable test in determining the constitutional issue is found in *Borden's Farm Products Co v Baldwin,* 293 US 194, 209; 55 S Ct 187, 192; 79 L Ed 281, 288 (1934):

"When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary."

The owner-operators, in their appellate brief, present what they feel are persuasive reasons why such a private contract should be prohibited in the instant case:

"But clearly if the Michigan Legislature could reasonably conclude that at least some of that increased tax burden caused by its earlier amendment to § 257.801(k) should be shifted to the carriers, it could also reasonably conclude that the challenged amendment was the best (and possibly the only) means for preventing carriers from compelling the owner-operators to pay the whole tax. The Michigan Legislature could have *[sic]* also have reasonably concluded that the ability of carriers to place the burden of the full tax increase on owner-operators would deter some drivers from becoming or remaining owner-operators. If this did occur, the likely result would be that § 257.801(k) would raise less revenue than hoped for. Again, the Michigan Legislature could have reasonably concluded that the challenged amendment was the best means to forestall this

possible revenue loss, and, in fact, might even encourage others to become owner-operators, thereby bringing in greater revenue and introducing greater flexibility into trucking operations in the state. Finally, of course, the Michigan Legislature, aside from the possible reasons already discussed, could simply and reasonably have concluded that the carriers rather than owner-operators should pay part of the increased tax because they are in a better financial position to do so."

Even though we cannot fully agree with all the above argument, we find merit in part. As we have mentioned, we cannot assume that state legislative enactments were adopted arbitrarily or without good reason to further some legitimate policy of the state. Whatever were the reasons behind the amendment, we do not know with certainty, nor is it important that we do, for a state legislature need not explicitly declare its purpose. *Allied Stores of Ohio, Inc v Bowers,* 358 US 522; 79 S Ct 437; 3 L Ed 2d 480 (1959). But quite possibly, the following is that reason. The business of common carriers is regulated by the Michigan Public Service Commission. Only certified carriers may solicit and engage in such business. The owner-operator, in order to participate therein, must lease his equipment to and, in essence, become an employee to a limited extent of the certified carrier. Thus, the latter is in a position to exert pressure upon the owner-operator of the tractor with respect to the terms of the leasing agreement. Even though this is not such an unequal position as the unorganized laborers were in, in *West Coast Hotel Co v Parrish, supra,* presumably the Legislature considered the public interest in the continued virility and stability of this segment of our economy to be sufficient to warrant adoption of this legislation pursuant to its police power in order to protect against possible harmful effects of such threat.

Therefore, we cannot say that the Legislature's action in adopting 1969 PA 309 was not pursuant to the welfare and interest of the State.

Furthermore, the instant case is not dissimilar to the situation found in *Barwise v Sheppard,* 299 US 33; 57 S Ct 70; 81 L Ed 23 (1936). In *Barwise,* a Texas statute imposing a tax on the production of oil was challenged as violating the contract clause of the Constitution of the United States and the due process of law clause of the Fourteenth Amendment. The facts were that the lessor had leased land for oil production which required the lessee to pay him a royalty interest of 1/8 of the total oil extracted free of cost to the lessor. At the time the lease was entered into, Texas law taxed the lessee, but not the lessor, of oil land. However, Texas amended the law with the intent to levy the tax ratably against all parties interested in the oil produced. In rejecting the argument that the tax imposed upon the lessor violated due process, the Supreme Court not only upheld the tax, but the state scheme of apportionment of said tax:

"Without question the State has the power to lay an excise on the production of oil. Here it is laid, admissibly we think on those having a direct and beneficial interest in the oil produced and is apportioned between them according to their interests. The apportionment is reasonable, not arbitrary, and is as reasonable to the lessors as to the lessees." 299 US at 39; 57 S Ct at 72–73; 81 L Ed at 26–27.

And finally, the Court found that the Texas tax statute did not constitute an impairment of contracts:

"[T]he lease was made in subordination to the power of the State to tax the production of oil and to appor-

tion the tax between the lessors and lessee. The taxing act does not purport to reach or affect any term of the lease. Plainly no stipulation in the lease can be of any avail as against the power of the State to impose the tax, prescribe who shall be under a duty to the State to pay it, and fix the time and mode of payment. And this is true even though it be assumed to be admissible for the lessors and lessee to stipulate as to who, as between themselves, shall ultimately bear the tax.[7] These views are but a reiteration and application of what repeatedly has been held in respect of contracts and their subordination to the taxing power." 299 US at 40; 57 S Ct at 73; 81 L Ed at 27.

We feel that much of the *Barwise* reasoning is applicable here. The Michigan Legislature enacted the 1969 amendment to MCLA 257.801(k); MSA 9.2501(k), after the contract in question was executed and enforceable. Nevertheless, even though the 1969 amendment clearly impaired that contractual obligation, the state had the authority to do so where it was safeguarding the vital interests of its people. As in *Barwise,* the state had the power to tax and apportion the tax between the carriers and the owner-operators in the best interest of the state.

One further point needs mention. In *El Paso v Simmons, supra,* in holding that the amendment did not unconstitutionally impair the obligations of contract, the Court made it clear that it did not deem the question whether the amendments were remedial or substantive to be important, as previous cases had. What was important in the Court's view was that the particular promise of reinstate-

---

[7] We are cognizant of this particular language in this sentence. However, we feel that whatever meaning is ascribed to this language it is dicta in light of the fact that the Court did not rest its holding on the assumption that the statute permitted contractual apportionment different from that established by the statute, but rather the Court sustained the constitutionality of the Texas statute.

ment[8] was not the central undertaking of the seller nor the primary consideration for the buyer's undertaking. The same is true here. Neither the owner-operators' central undertaking, nor the carriers' primary consideration for entering into the applicable collective agreements was the alleged obligation of the owner-operator to pay 100% of the registration fee. It was but an incidental part, leaving the bulk of the contract unimpaired. Therefore, since the impact of the 1969 amendment of MCLA 257.801(k), *supra,* on the main thrust of the contract is slight and presumably the state interest in adopting the 1969 amendment significant, we can only conclude that the Contract Clause does not prohibit the state from enforcing this amended statute even though such action does impair an obligation of a contract between private parties and will continue to do so in the future.

II. *Is the primary question presented in the instant action (the constitutionality issue just discussed) academic and hypothetical and thus not properly before the Michigan courts?*

Basically, the owner-operators contend that the validity of the contract must first be determined pursuant to terms written within the contract itself, which require the parties to pursue administrative clarification, before seeking judgment from state courts. We now wonder if the owner-operators would still pursue this argument in light of our discussion and findings on the previous issue?

---

[8] In *El Paso v Simmons, supra,* the challenged statutory amendments permitted forfeiture of public land if the purchaser failed to make the required interest payments within a five year period from his date of default. Prior to these amendments the purchaser who had failed to pay the interest due had a right to have his claim reinstated at any time provided no third-party interest had intervened.

Nevertheless, plaintiffs brought their complaint to a Michigan court under both state and Federal law and upon the Michigan declaratory judgment rule. GCR 1963, 521.[9] It is within the sound discretion of the circuit court to determine whether or not a declaratory judgment is appropriate. Nowhere is it now contended that the circuit judge has abused his discretion nor are any persuasive reasons or rules of law or procedure offered. In the absence of anything to the contrary, the exercise of discretion of the circuit court is upheld and, consequently, an appeal may be taken from that decision.

[9] ".1 Power to Make. In a case of actual controversy within its jurisdiction, any circuit court of this state may declare the rights and other legal relations of any interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted.

\* \* \*

".3 Other Adequate Remedy. The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate.

\* \* \*

".5 Effect; Review. Declaratory judgments shall have the force and effect of final judgments and shall be reviewable as final judgments.
".6 Other Relief. Further necessary or proper relief based on a declaratory judgment may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by the declaratory judgment."

"Authors' Comments
"Declaratory judgment has been heralded as one of the most significant procedural reforms of the century. Its purpose is to enable parties, in appropriate circumstances of actual controversy, to obtain an adjudication of their rights before actual injury occurs or to settle matters before they ripen into violations of law or a breach of contractual duty, to avoid a multiplicity of actions by affording a remedy for declaring in one expedient action the rights and obligations of all litigants, or to avoid the strictures associated with obtaining coercive relief, when coercive relief is neither desired nor necessary to resolve the matter." 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), pp 683–684.

Prior to effective date of new rules, an equitable declaratory judgment proceedings could not be maintained where claim was legal and party had adequate remedy by defense to a regular action at law where trial by jury could be had. *United States Fidelity & Guaranty Co v Kenosha Inv Co,* 369 Mich 481 (1963).

III. *Has the National Labor Relations Act pre-
empted the area of apportionment of ultimate
tax burdens from any state encroachments?*

To properly understand the developing philoso-
phy and the operation of the pre-emption principle
it is necessary to examine the background on the
development of the field of labor relations law. The
United States Constitution is the source of all
Federal power. It is also necessarily the source of
the Federal government's power in the field of
labor relations. Specifically, the power in this field
is based on the commerce clause, US Const, art I,
§ 8. Most Federal labor relations statutes clearly
state that the regulations are designed to elimi-
nate from the channels of commerce those obstruc-
tions arising from labor disputes.

To say no more than this would be to pass over
some of the most interesting and enlightening
phases of American Constitutional history. The
history of the determination of the exact nature of
the grant of power contained in the commerce
clause is in many ways like the history of the law
of labor relations. They both have developed in
written opinions delivered by individual courts and
judges. The economic and social thinking of judges
has influenced such development to a large extent.
Larger economic, social and political forces or the
electorate have compelled changes in both.

The supremacy clause, US Const, art VI, states
that all laws enacted by the Congress under the
Constitution are the "supreme law of the land"
binding anywhere in the land "any thing in the
Constitution or laws of any state to the contrary
notwithstanding". The commerce clause gives Con-
gress the power to regulate commerce "among the
several states". Article I, § 8 of the United States

Constitution contains the so-called "necessary and proper" clause which grants Congress additional power to make "all laws * * * necessary and proper" for carrying out all the other powers granted by the Constitution. One of the early Supreme Court cases construing these Constitutional provisions was *Gibbons v Ogden,* 22 US (9 Wheat) 1; 6 L Ed 23 (1824). There the opinion of the court was delivered by Chief Justice John Marshall with a concurring opinion by Associate Justice William Johnson. Speaking with reference to the commerce clause, the Chief Justice said that the clause gave Congress the power to regulate all the commerce of the country except that "the completely internal commerce of a state * * * [might] be considered as reserved for the state itself". Defining commerce the Chief Justice said:

"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes * * * intercourse * * * in all its branches * * * ." 22 US at 189–190; 6 L Ed at 68.

Commerce, in the opinion of Mr. Justice Johnson, was "in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange * * * ". According to him, "the subject, the vehicle, the agent, and their various operations become the objects of commercial regulation".

The meaning of the term "commerce" and the scope of congressional power to regulate the same shrunk to a large degree in the Supreme Court's conception over a period of years. In *United States v E C Knight Co,* 156 US 1; 15 S Ct 249; 39 L Ed 325 (1895), it was held that manufacturing did not come either within the meaning of the term "commerce" or the power of Congress to regulate it.

The Court there said at p 12: "Commerce succeeds to manufacture, and is not a part of it".

In recent years the Supreme Court has abandoned the position taken in the *Knight* case and has reverted to a position similar to the one expressed in *Gibbons v Ogden, supra.* Mr. Justice Jackson speaking for the court in *Wickard v Filburn,* 317 US 111, 124; 63 S Ct 82, 89; 87 L Ed 122, 135 (1942) said:

"Whether the subject of the regulation in question was 'production,' 'consumption,' or 'marketing' is, therefore, not material for purposes of deciding the question of federal power before us."

He felt that the important question related to the effect of the regulated matter on the national economy. Even if "activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce". A similar view has been taken by the Court in upholding the constitutionality of the National Labor Relations Act (NLRA) as a valid exercise of the power to regulate commerce even when applied to a manufacturing company.

The United States Supreme Court held that where interstate commerce was affected, Federal law, to the extent that it either prohibited or protected conduct in employer-employee relations pre-empted the field.[10] State legislation regulating the same conduct or activity could not be applied. The NLRB (National Labor Relations Board) being charged with administration of the Federal law, its jurisdiction was exclusive, even though it had actually declined or would decline under self-im-

---

[10] Commerce Clearing House Labor Law Reports, (CCH), § 5505.072.

posed restraint, to exercise its jurisdiction.[11] Effective November 13, 1959, Congress amended the NLRA to permit state courts and labor agencies to act in cases over which the NLRB refuses to exercise its jurisdiction. The Supreme Court's pre-emption doctrine would, however, continue to apply with respect to those cases in which the NLRB will act or which involved conduct that is protected under the NLRA.

If the Federal law permits state agencies to act and state law to control, state laws can operate even where they differ from the Federal law. Furthermore, states are free, subject to other constitutional limitations, to regulate details in the labor field (always within their own boundaries) which are not covered by Federal law.[12]

They may provide, for example, for union unfair practices where Federal law provides for none,[13] or they may add to those contained in Federal law.[14] On the other hand, it seems that the Federal government may, if it wishes and if it clearly provides or strongly suggests that states shall not legislate on a certain subject covered by Federal law, preclude state legislation on the subject.[15]

The national labor policy today is the sum of the policies and provisions of the major Federal labor relations statutes: the Railway Labor Act, the Norris-La Guardia (Anti-Injunction) Act, the National Labor Relations Act as amended, the Taft-Hartley Act (the Labor Management Relations Act, 1947) and the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act).

[11] CCH § 5505.353.
[12] CCH §§ 5505.42, 5505.44.
[13] CCH §§ 5505.46–5505.466.
[14] CCH § 5505.45.
[15] CCH § 5505.072.

These are augmented by the manner of administration by the Federal labor agencies and interpretation by the courts.

It is possible to procure a formal opinion from the NLRB whether it will assert jurisdiction in a particular case if a proceeding is currently pending before an agency or a court of a state or territory and the opinion is requested, either by a party to that proceeding or by the agency or the court itself. It has been stated that the Board " 'will limit its advisory opinion to the jurisdictional issue confronting it, and will not presume to render an opinion on the merits of the case or on the question of whether the subject matter of the dispute is governed by the Labor Management Relations Act of 1947, as amended.' "[16] No such request was made with reference to this cause.

A declaratory order regarding jurisdiction may be obtained only on the request of NLRB General Counsel and if both an unfair labor practice charge and a representation petition are pending concurrently in a regional office. The limited scope of the NLRB's ruling is undoubtedly designed to preclude a plea of the pre-emption doctrine in a proceeding for a declaratory order.[17]

The United States Supreme Court seems to have taken a pragmatic approach to the analysis of relevant facts and circumstances pertaining to the issue of pre-emption. However, the results were always ascribed to the will of Congress.[18] Thus, Justice Jackson in *Garner v Teamsters Union*[19] stated that "[t]he National Labor Management

[16] CCH *1970 Guidebook to Labor Relations* (Guidebook), p 29.

[17] *Ibid.*

[18] Morris, *The Developing Labor Law* (Bureau of National Affairs, Inc, 1971), p 783.

[19] 346 US 485, 488; 74 S Ct 161, 164; 98 L Ed 228, 238 (1953).

Relations Act * * * leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of Congressional will the area in which state action is still permissible." "This penumbral area can be rendered progressively clear only by the course of litigation."[20] In a later opinion Justice Frankfurter characterized the statutory implications concerning what had been taken from the states and what had been left to them as of a "Delphic nature,[21] to be translated into concreteness by the process of litigating elucidation".[22]

The Court seemed to limit if not entirely abandon its Delphic approach to fathoming the will of Congress on the question of delimiting state action permitted in labor relations in its decision in *Linn v United Plant Guard Workers,* 383 US 53; 86 S Ct 657; 15 L Ed 2d 582 (1966). The case concerned itself with the limits of state jurisdiction in a libel case that involved a handbill distributed during an

[20] *Weber v Anheuser-Busch, Inc* 348 US 468, 480–481; 75 S Ct 480, 488; 99 L Ed 546, 558 (1955).

[21] The comparison with the procedures at ancient Delphi was pertinent. At Delphi, the "holy ones", and the priests, were charged with the responsibility of interpreting the will of Apollo, expressed through the Pythia, his prophetess. Originally, the Pythia was a virgin, a virgin being "the purer vehicle for divine communication", according to tradition. Farnell, *Oracle,* 20 Encyclopedia Brittanica, 142 (11th Ed, 1911). Later, however, using possibly the earliest recorded legal fiction, the Greeks changed the rule, and a married woman over 50 years of age *attired as a virgin* was employed as the Pythia. Inspired by mystic vapors, she spoke the will of Apollo. Her utterances may have only been unintelligible murmurs, but they were interpreted into relevance and set in metric or prose sentences by the "holy ones". *Ibid.* According to Plutarch, "[s]o great became the fame and influence of Apollo that all Greece resorted to his instrument and mouthpiece at Delphi for information on the cult procedure, politics, law and personal conduct in every day affairs, from monarchs and tyrants to ordinary individuals, in spite of the fact that the responses were for the most part vague, evasive and ambiguous, especially on critical questions." James, *The Ancient Gods* (G P Putnam's Sons, 1960), p 244.

[22] *International Association of Machinists v Gonzales,* 356 US 617, 619; 78 S Ct 923, 924; 2 L Ed 2d 1018, 1021 (1958).

NLRB election campaign. Mr. Justice Clark, speaking for the Court, acknowledged the Court's active role in the process by stating that allowing the state to redress such a libel if it was issued with "knowledge of its falsity, or with reckless disregard of whether it was true or false", would be consistent with "the actual need of national labor policy" which the Court found implicit in the National Labor Relations Act. Placing emphasis on the Court's discretionary function in interpreting this national labor policy, the Court concluded that "if experience shows that a greater curtailment, even a total one, should be necessary to prevent impairment of that policy, the Court will be free to reconsider today's holding. We deal here not with a constitutional issue but solely with the degree to which state remedies have been preempted by the Act."[23]

In *San Diego Building Trades Council v Garmon*, 359 US 236; 79 S Ct 773; 3 L Ed 2d 775 (1959), the Court refined the application of the pre-emption doctrine to situations where the conflict between state and Federal laws is indirect, unclear or only foreseeable.

An injunction by a state labor board against mass picketing which obstructed streets and plant entrances, violence and threats of violence was approved as properly under state jurisdiction in *UAW v Wisconsin Board*, 351 US 266; 76 S Ct 794; 100 L Ed 1162 (1956), despite the fact that the conduct constituted an unfair labor practice under § 8 (b)(1)(A) and was thus within the jurisdiction of the NLRB.

Similarly, the Court permitted a state court to award damages for tortious conduct involving vio-

---

[23] *Linn v Plant Guards, supra,* 383 US at 67; 86 S Ct at 665; 15 L Ed 2d at 592.

lence and threats, even though the conduct was prohibited by the NLRA and was within the jurisdiction of the NLRB. See *United Construction Workers v Laburnum Construction Corp,* 347 US 656; 74 S Ct 833; 98 L Ed 1025 (1954). It is important for purposes of clarification that we note that the Supreme Court in the *Garmon* cases[24] said that the focus of its decision in *Laburnum, supra,* was not "the fact that the state remedy had no federal counterpart".[25] Although the lack of conflict in remedies had given support to the *Laburnum* opinion and to *Russell,*[26] that fact would have been insufficient to prevent Federal pre-emption in either case. The court emphasized in *Garmon* that the determining factor in these exceptional cases was "'the type of conduct' involved, *i.e.,* 'intimidation or threats of violence'". 359 US at p 248; 79 S Ct at 781; 3 L Ed 2d at 785. The Supreme Court further explained that the states had the power to act in such situations because "the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the states" of power.[27] Further, in *Gonzales, supra,* at p 621 the Court held that the potential conflict was too contingent and too remotely related to the public interest to justify depriving state courts of jurisdiction.

The plaintiffs argue that the amendment adopted by the Legislature did not constitute an

[24] In addition to the first *Garmon* citation, *supra,* there was a prior opinion by the Supreme Court under the same title appearing in 353 US 26; 77 S Ct 607; 1 L Ed 2d 618 (1957).

[25] *Garmon, supra,* 359 US 236, 247; 79 S Ct 773, 781; 3 L Ed 2d 775, 785 (1959).

[26] *UAW v Russell,* 356 US 634; 2 L Ed 2d 1030; 78 S Ct 932 (1958).

[27] 359 US at 244; 79 S Ct at 779; 3 L Ed 2d at 782.

exercise of power to levy or assess a tax because the existing fee schedule was not altered and no additional revenue accrued to this state. They claim the 1969 amendment sought only to prohibit any contractual arrangement in contravention of the state's authority to apportion the registration fee. Although we do not concede plaintiff's interpretation of the amendment as not producing additional revenue to the state in light of our discussion under Issue No. I, we do not deem it necessary to answer this question since we believe that the amendment comes in as an exception to the pre-emption theory on another basis.

In *Local 24 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO v Oliver,* 358 US 283; 79 S Ct 297; 3 L Ed 2d 312 (1959), we find that the state may alter the bargain struck by the carriers and owner-operators, but only for the reasons of local health or safety regulations, *i.e.,* a proper invocation of the police power. In *Oliver* the state statute was struck down because it was in conflict with the provisions of a collective bargaining agreement and such statute was determined by the Court not a proper exercise of the police power as it changed wages and contracted rental rates by its application. The facts of this case are at variance in that, as shown by our discussion of Issue No. I, this legislative enactment was an exercise of the *police power* of the state. Further, we find that the allocation of the tax burden by virtue of the provisions of the 1969 amendment dealt only with a peripheral matter of a very unsubstantial nature in proportion to the total consideration of the contractual arrangement between the parties.

Plaintiffs place heavy reliance on *Oliver* but, as

indicated above, we conclude that the facts here constitute a basis to distinguish the enactment as a proper exercise of police power in this case.

Further, we have made a careful examination of §§ 7 and 8 of the National Labor Relations Act which, according to the plaintiffs, constitute the basis for a claim of pre-emption. We find nothing in the statutes nor any of the cases cited in the footnotes and commentaries with respect to such sections that would sustain the plaintiff's position on the issue of pre-emption.

"Section 7 does not deprive state of power to afford remedy of reinstatement for wrongful expulsion of a union member." *International Association of Machinists v Gonzales, supra.*

"Section 7 does not impliedly exclude state powers in case of injurious conduct which Board is without express power to prevent and which, therefore, either is governable by the state or is entirely ungoverned." *Garner v Teamsters, Chauffeurs and Helpers Local Union No 776 (AFL), supra.*

"State is not prevented from exercising its historic powers over such traditionally local matters as public safety and order and the use of streets and highways." *Ibid.*

"McKinney's N.Y. Unconsolidated Laws § 7[?], providing that no person shall receive dues from employees of a labor organization if an officer thereof has been convicted of a felony is not invalid as conflicting with this chapter [7], particularly Section 157 of this title, providing that employees shall have the right to self-organization through representatives of their own choosing." *De Veau v Braisted,* 5 AD2d 603; 174 NYS2d 596 (1958), *leave to appeal denied* 6 AD2d 819; 176 NYS2d 230, *aff'd* 5 NY2d 236; 183 NYS2d 793; 157 NE2d 165 (1959), *motion denied* 6 NY2d 810; 188 NYS2d 196; 159 NE2d 685, *aff'd* 363 US 144; 80 S Ct 1146; 4 L Ed 2d 1109 (1960).

"This chapter does not preempt all state control, nor more specifically the state police power." *United Broth-*

*erhood of Carpenters & Joiners of America v Pascagoula Veneer Co,* 228 Miss 799; 89 So 2d 711 (1956).

"This chapter does not preempt all state control, nor more specifically exercise of the state police power." *Southern Bus Lines, Inc v Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America,* 205 Miss 354; 38 So 2d 765 (1949).[28]

Further, we find that Federal law has not preempted the subject matter of the 1969 amendment under consideration here. Accordingly, this matter is remanded to the trial court for entry of a declaratory judgment consistent with this opinion.

All concurred.

---

[28] Quotations from annotation to 29 USCA 151—REPORTER.