GREEK v BASSETT

Docket No. 51886. Submitted October 12, 1981, at Detroit.—Decided January 20, 1982. Leave to appeal applied for.

Donald Greek, administrator of the estate of Jack L. Stone, deceased, brought a medical malpractice action in Wayne Circuit Court naming· several defendants, including Joseph S. Bassett, M.D., and Hahn Lee, M.D., jointly and severally. The action arose in connection with the medical care the deceased received while in the hospital for replacement of his pacemaker, approximately 16 months before his death. Plaintiff's case against all defendants except Bassett and Lee was settled and the action against those parties dismissed. The jury returned a verdict of no cause of action against defendants Bassett and Lee and judgment was entered, Charles Kaufman, J. Plaintiff appeals. *Held:*

1. The trial court did not err by admitting into evidence the death certificate prepared in relation to Stone's death, indicating that death was caused by cardiac arrest as a consequence of arteriosclerotic heart disease. The rules of evidence allow the stated cause of death in a death certificate to come into evidence.

2. Plaintiff's argument that his counsel was misled into believing that the court had ruled in his favor by ruling that the certificate would be received "under the causes and effects" may be true, but any misleading that may have occurred by the ruling is attributable to counsel and cannot be attributed to the trial court.

Affirmed.

1. Statutes — Amendments — Judicial Construction — Changes in Phraseology.

It is presumed in construing an amendment to a statute that a

References for Points in Headnotes
[1] 73 Am Jur 2d, Statutes § 325.
[2, 3] 20 Am Jur 2d, Courts §§ 84, 85.
[3, 5] 20 Am Jur 2d, Courts § 86.
[4, 5] 73 Am Jur 2d, Statutes § 333.
[6] 30 Am Jur 2d, Evidence § 1009.
Official death certificate as evidence of cause of death in civil or criminal action. 21 ALR3d 418.

change in phraseology implies that a change in meaning was also intended; this rule of construction applies equally well to cases involving the repeal of one statute and the enactment of another covering the same subject area.

2. COURTS — COURT RULES — STATUTES — RULES OF EVIDENCE.

The court rule controls where the rule and a statute conflict on a matter of judicial procedure, including matters relating to evidentiary rules.

3. EVIDENCE — RULES OF EVIDENCE — COMMITTEE NOTES.

The Committee Notes accompanying the Rules of Evidence are merely aids to the bench and bar and are not authoritative interpretations.

4. STATUTES — ADOPTION OF STATUTES — JUDICIAL CONSTRUCTION — PRESUMPTIONS.

There is a presumption where a statute is adopted from another jurisdiction that the Legislature intended that the statute be construed in accordance with the judicial construction given by such other jurisdiction.

5. COURTS — COURT RULES — JUDICIAL CONSTRUCTION.

Doctrines of statutory construction are applicable as an aid in determining the Michigan Supreme Court's intention in adopting a particular court rule.

6. EVIDENCE — DEATH CERTIFICATES.

A death certificate is admissible into evidence as evidence of the cause of death listed therein (MCL 333.2886; MSA 14.15[2886], MRE 803[9]).

*Lopatin, Miller, Freedman, Bluestone, Erlich & Rosen* (by *Steven G. Silverman),* for plaintiff.

*Buesser, Buesser, Snyder & Black* (by *William R. Buesser* and *Carol H. Lesnek-Cooper),* for defendants.

Before: MACKENZIE, P.J., and BRONSON and BEASLEY, JJ.

PER CURIAM. Plaintiff appeals as of right from a

Wayne County jury's verdict of no cause of action in this medical malpractice case.[1]

The instant cause of action arose from decedent's, Jack Stone's, hospitalization for replacement of his pacemaker implanted some 18 months earlier by defendant Dr. Bassett on defendant Dr. Lee's referral. Prior to surgery, Stone was given various dosages of Nembutal, Innovar, and atropine. Following surgery, Stone was given dosages of five other drugs.

The nurses' notes reflect that Stone became disoriented and restless at approximately 2 a.m. on May 19, 1973, the morning following the surgery. The intern on call was notified. Apparently, the intern did not examine Stone, but had him transferred to the coronary care unit. Further evidence submitted during trial showed that, contrary to standard hospital procedure, the intern did not contact either defendant, whose names were listed on Stone's hospital chart. The intern also failed to cancel all previous drug orders, which defendants further indicated was contrary to standard hospital procedure.

Dr. Lee arrived at the hosptial at 10 a.m. that same morning and was then notified of Mr. Stone's hospitalization and condition. He notified Dr. Bassett. The doctors implemented various procedures and administered certain drugs.

Dr. Stone, the decedent's son, was notified of his father's condition by his brother, who also told him about the type and dosage of drugs that decedent had received. Dr. Stone requested that his brother tell Dr. Lee to use the drug Narcon. Narcon is a drug antagonist that counteracts the effect of certain other drugs. Dr. Lee did not

---

[1] Plaintiff settled his case against four other defendants and the action against them was dismissed.

administer the Narcon. When Dr. Stone arrived at the hospital, he asked Dr. Lee why he did not administer the drug. Dr. Lee allegedly told him that he was not familiar with the drug and did not believe it would be beneficial.

Stone's condition deteriorated and he began to exhibit Cheyne-Stokes breathing. His blood pressure fell to 60/0 many times and for a prolonged period. Dr. Stone testified that the specific effect of a prolonged period of 60/0 blood pressure is irreversible brain damage. Stone remained comatose about 24 hours.

According to Dr. Lee, Stone's condition improved. Dr. Lee testified that Stone was well oriented and ambulating well for several days before he was discharged on May 30, 1973. Dr. Lee testified that Stone's mental and physical condition were as they had been prior to hospitalization until February, 1974. In February, 1974, Dr. Lee determined that Mr. Stone was showing obvious signs of Parkinsonism (a group of neurological disorders marked by hypokinesia, tremor and muscular rigidity).

Stone was examined by Dr. Kapphahn, Chief of Neurology at Henry Ford Hospital. In a report dated March 29, 1974, Dr. Kapphahn stated:

"Degenerative brain disease with nonpsychotic organic brain syndrome and rigid—bradykinetic parkinson's syndrome. Associated contribution of episode of cerebral anoxia cannot be entirely excluded but is not felt to be etiologically primary."

Stone was subsequently followed by Dr. Kole, who treated him for Parkinson's disease and senile dementia.

Stone remained alive for 16 months after this incident until his death on September 12, 1976.

Dr. Stone testified as to the changes he observed in his father: his coordination, his ability to calculate, and his ability to do the things he had done before were all gone. According to his son, decedent lost the will to live because he could not do things independently. Stone's condition became progressively worse.

Plaintiff contended that both defendants breached the applicable standards of care in many ways. Dr. Stone testified that his father suffered oxygen deprivation, resulting in "irreversible brain damage". Dr. Stone indicated that defendants' departures from the proper standards of care led to prolonged lack of oxygen, causing central nervous depression and sapped decedent's brain of the will to function in that way needed to survive. Defendant's case, which was apparently more convincing in the jurors' minds, rebutted plaintiff's allegations. Defendants argued that Stone's death was the result of arteriosclerotic heart disease, from which decedent suffered even prior to being treated by defendants.

All questions on appeal center on the admissibility of the death certificate prepared in relation to Stone's unfortunate demise. This certificate had been prepared by Dr. Bennish and indicated that death was caused by cardiac arrest as a consequence of arteriosclerotic heart disease. Plaintiff asserts that the death certificate was erroneously admitted into evidence and that reversal is required.

Plaintiff's argument in large part relies on this Court's decision in *Smith v Children's Hospital of Michigan,* 33 Mich App 186; 189 NW2d 753 (1971), *lv den* 385 Mich 779, 781 (1971). In *Smith,* this Court construed MCL 326.16; MSA 14.236, which provided that a death certificate could be used at

trial as prima facie evidence of identity, occurrence, time, and place of death. Due to the explicit language of MCL 326.16; MSA 14.236, this Court held that a death certificate was not admissible as evidence of the cause of death.

The problem with plaintiff's reliance on *Smith* is that MCL 326.16; MSA 14.236 was repealed prior to trial in this matter. Effective September 30, 1978, MCL 333.2886; MSA 14.15(2886) embodied the legislative expression of policy concerning a death certificate's admissibility. This provision provides:

"A certified copy of a vital record, or any part thereof, or a certificate of registration issued in accordance with sections 2881 and 2882 is considered for all purposes the same as the original and is prima facie evidence of the facts stated in the original."

Prior to the enactment of this provision, the Michigan Supreme Court adopted the Michigan Rules of Evidence. MRE 803(9) provides for the following exception to the hearsay rule:

"*Records of vital statistics.* Records or data compilations, in any form, of births, fetal deaths, deaths, or marriages, if the report thereof was made to a public office pursuant to requirements of law."

Plaintiff argues that neither the new statutory provision nor the rule of evidence changes the law as propounded in *Smith.* We disagree.

In respect to the statutory provision, plaintiff contends that its reference to "prima facie evidence of the *facts* stated in the original" (emphasis added) precludes the admissibility of the certificate's stated cause of death. Plaintiff notes that a statement of the cause of death in a certificate is

not a fact, but an opinion. We believe, however, that plaintiff gives too literal an interpretation to the term "fact". If we were to require that a statement in a death certificate be a "fact" in the sense of an absolute objective reality, virtually nothing in a death certificate would be admissible. For instance, the identity of the deceased, although usually not in dispute, is sometimes not easily ascertainable. In any case, the death certificate's statement of "identity" is merely the examiner's opinion of identity. The same would be true for the stated time of death.

We also note that in construing an amendment to a statute, it is presumed that a change in phraseology implies that a change in meaning was also intended. *Lawrence Baking Co v Unemployment Compensation Comm,* 308 Mich 198, 205; 13 NW2d 260 (1944), *cert den* 323 US 738; 65 S Ct 43; 89 L Ed 591 (1944), *Michigan Transportation Co v Secretary of State,* 41 Mich App 654, 665; 201 NW2d 83 (1972), *lv den* 389 Mich 767 (1973). While this case actually involves the repeal of one statute and the enactment of another covering the same subject area, the presumption of a change of meaning principle is equally applicable. We believe the Legislature's failure to reenact the limiting language of MCL 326.16; MSA 14.236 represents its belief that the purposes for which statements in a death certificate are admissible should be broadened.

Historically, Michigan law concerning the admissibility of a stated cause of death in a death certificate has varied in different eras. In *Krapp v Metropolitan Life Ins Co,* 143 Mich 369; 106 NW 1107 (1906), the Michigan Supreme Court dealt with yet another statute covering this subject matter which allowed the use of death certificates

for the "facts recorded therein". In *Krapp,* although the explicit issue under consideration was not the same as in this case, the court held that the reference to the stated cause of death included within the certificate was admissible. See, also, *Gilchrist v Mystic Workers of the World,* 188 Mich 466, 474; 154 NW 575 (1915).

We further note that statutes from other states referring to the admissibility of "facts" contained in death certificates have been near universally construed to allow introduction of the certificate for the stated cause of death. See, among others, *Loughlin v Marr-Bridger Grocer Co,* 10 SW2d 75 (Mo App, 1928), *Bishop v Guthrie,* 25 Ohio Op 2d 375; 184 NE2d 910 (1962), *La Count v General Asbestos & Rubber Co,* 184 SC 232; 192 SE 262 (1937), *Bozicevich v Kenilworth Mercantile Co,* 58 Utah 458; 199 P 406 (1921), *Pilcher v New York Life Ins Co,* 25 Cal App 3d 717; 102 Cal Rptr 82 (1972), *Anderson v Commercial Travelers Mutual Accident Ass'n,* 73 App Div 2d 769; 423 NYS2d 542 (1979). See, also, for a general overview of this subject, Anno: *Official Death Certificate as Evidence of Cause of Death in Civil or Criminal Action,* 21 ALR3d 418.

Plaintiff further argues that even if this Court were to determine that MCL 333.2886; MSA 14.15(2886) changes the law as expressed in MCL 326.16; MSA 14.236, MRE 803(9) follows the old rule. As such, plaintiff argues that the rule of evidence and the statute would conflict. We agree with plaintiff that where a statute and court rule are conflicting on a matter of judicial procedure, including evidentiary rules, the rule controls. *Perin v Peuler,* 373 Mich 531, 541-542; 130 NW2d 4 (1964), *James v Dixon,* 95 Mich App 527, 530; 291 NW2d 106 (1980). We disagree, however, that the

rule and the statutory provision under consideration here conflict. If anything, MRE 803(9) more obviously allows the stated cause of death in a death certificate to come into evidence. Unlike the statutory provision, the rule does not use the contextually imprecise term "facts" contained in the certificate. In arguing that MRE 803(9) is consistent with *Smith, supra,* plaintiff relies on the Committee Note concerning the new evidentiary rule's impact on prior law. This note provides:

"Exception 803(9). MRE 803(9) is generally consistent with prior Michigan law. MCLA § 326.16 provides that records of vital statistics (births, adoptions, deaths, marriages and divorces) 'shall be prima facie evidence in all courts and for all purposes of the facts recorded therein pertaining to identity, occurrence, time and place.' "

We first note that the committee refers to MRE 803(9) as being "generally consistent" with prior law. The use of the term "generally" implies that, in fact, there exists some inconsistency between the new rules and prior law. More important, however, is the fact that the Committee Notes are merely aids to the bench and bar and are not authoritative interpretations. See Michigan Court Rules Annotated, Evidence Rules (West Pub Co, 1979), p IV.

MRE 803(9) is identical to FRE 803(9). Where a statute is adopted from another jurisdiction, it is presumed that the Legislature intended that the statute be construed in accordance with the judicial construction given by such other jurisdiction. *State v Holmes,* 115 Mich 456, 459; 73 NW 548 (1898), *Bredemeier v Kentwood Board of Education,* 95 Mich App 767, 771; 291 NW2d 199 (1980).

Doctrines of statutory construction are applicable as an aid in determining the Michigan Supreme Court's intention in adopting a particular rule. *People v Lange,* 105 Mich App 263, 266; 306 NW2d 514 (1981), *Cleveland-Cliffs Iron Co v First State Ins Co,* 105 Mich App 487, 493-494; 307 NW2d 78 (1981). At the time the Michigan Supreme Court adopted the Michigan Rules of Evidence, we have located only one federal decision dealing with FRE 803(9). This decision relied on FRE 803(9) in ruling that a reference to the cause of death appearing in a death certificate is admissible into evidence. See *Weiner v Metropolitan Life Ins Co,* 416 F Supp 551, 558 (ED Pa, 1976). Moreover, the federal courts had generally allowed the stated cause of death in a record of death to be admitted into evidence pursuant to 28 USC 1732, the general business exception to the hearsay rule in effect prior to the adoption of the Federal Rules of Evidence. See, *e.g., Shell v Parrish,* 448 F2d 528, 530-531 (CA 6, 1971).

Plaintiff lastly argues that his counsel was misled by the trial court. Plaintiff asserts that his attorney believed the court had ruled in his favor and that he was subsequently surprised when the jury was allowed to examine the death certificate as an exhibit. While we do not doubt plaintiff's attorney's assertion that he believed himself misled, any misleading cannot be attributed to the trial court. Plaintiff concedes that the trial court stated that the certificate would be received "under the causes and effects".[2] While in the heat of battle this ruling may have seemed ambiguous, we

---

[2] We herewith express our sumpathy for plaintiff's counsel. He has had the misfortune of losing on this issue twice. Once in *Smith, supra,* where the death certificate was ruled inadmissible for purposes of establishing the cause of death, and now, again, where we hold the death certificate properly admitted for the stated cause of death.

are unable to construe it any other way than as a ruling in defendants' favor.

Affirmed. No costs, questions of first impression concerning the proper construction of a statutory provision and rule of evidence being involved.[3]

---

[3] Following the first draft of this opinion, *Wallace v Garden City Osteopathic Hospital,* 111 Mich App 212; 314 NW2d 557 (1981), was released. Judge T. M. BURNS' concurring opinion in *Wallace,* relying solely on the new language of the Public Health Code, also reaches the conclusion that the stated cause of death in a death certificate is admissible into evidence.