Frank J. KELLEY, Attorney General of the State of Michigan, ex rel., MICHIGAN NATURAL RESOURCES COMMISSION, Michigan Water Resources Commission and David F. Hales, Director of the Michigan Department of Natural Resources, Plaintiffs,

v.

Lester TISCORNIA, James W. Tiscornia, Edward C. Tiscornia, Loren Gerber, Defendants,

and

MANUFACTURERS NATIONAL BANK OF DETROIT, Defendant & Third–Party Plaintiff,

v.

UNITED STATES of America, Third–Party Defendant.

No. 5:90–CV–62.

United States District Court, W.D. Michigan, S.D.

April 23, 1993.

**1318**

Paul F. Novak, Asst. Atty. Gen., Environmental Protection Div., Lansing, MI, for plaintiffs.

Jon R. Muth, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for Tiscornia defendants.

Steven C. Nadeau, Dickinson, Wright, Moon, VanDusen & Freeman, Frederick J. Dindoffer, Bodman, Longley & Dahling, Detroit, MI, for defendant Bank.

Michael L. Shiparski, Asst. U.S. Atty., Grand Rapids, MI, Thomas H. Pacheco, Leland S. VanKoten, U.S. Dept. of Justice, Washington, DC, for U.S.

## MEMORANDUM OPINION AND ORDER

McKEAGUE, District Judge.

■ The action is brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and the Michigan Environmental Response Act ("MERA"), M.C.L.A. § 299.601 et seq. The plaintiffs are seeking compensation for expenses incurred cleaning up two sites: the Auto Specialties Manufacturing Company ("AUSCO") facility located in St. Joseph, Michigan (the "St. Joseph Facility") and the facility located in Benton Harbor, Michigan (the "Riverside Facility"). Counts I and II of the Second Amended Complaint seek relief under CERCLA and allege that the Tis-cornias owned or operated the sites during times when hazardous substances were released. Counts III and IV seek relief under MERA and allege that the Tiscornias owned or operated the sites at the time of disposal of a hazardous substance.[1]

This matter is before the Court on cross-motions for summary judgment. Plaintiffs move for partial summary judgment as to the liability of defendants Edward, Lester and James Tiscornia ("the Tiscornia defendants").[2] The Tiscornias also move for summary judgment. The Court has reviewed the pleadings and exhibits, heard oral argument, and finds the matter ready for disposition.

### FACTS

Lester, James and Edward Tiscornia held all of the voting stock of AUSCO, a closely-held corporation. Lester held 83%. James and Edward held the balance, although the precise division between the two is unclear from the pleadings. Each of the Tiscornias was also a member of the Board of Directors and an officer of the corporation. Since 1977, each of the Tiscornia defendants served as a member of the AUSCO Executive Committee. The committee, comprised of four individuals, made decisions for the corporation. Under the corporate by-laws, the Executive Committee exercised "the powers of the Board of Directors in the management of the business affairs and property of the corporation." The Executive Committee acted and the Board then approved the Executive Committee minutes or actions.

Minutes from the meetings of the Executive Committee show that the members reviewed and discussed the Notice of Violations that AUSCO facilities received from the Environmental Protection Agency ("EPA") and the Michigan Department of Resources

---

1. Because the provisions set forth in MERA were modeled after CERCLA, the analysis as to MERA liability is coextensive. The Michigan courts have authorized this approach. "Where a statute is adopted from another jurisdiction, it is presumed that the Legislature intended that the statute be construed in accordance with the judicial construction given by such other jurisdiction." *Greek v. Bassett*, 112 Mich.App. 556, 564, 316 N.W.2d 489 (1982).

2. The case has been bifurcated and at this time only liability issues are before the Court.

("MDNR").[3] In 1979, three different letters were sent to AUSCO indicating that the Company's landfill operations were not in compliance with state regulations. Each letter sent from the MDNR was routed to the Executive Committee through an internal AUSCO memo. The Committee reviewed the memorandum and made arrangements to locate an attorney with whom to consult regarding environmental issues. According to the defendants, the Executive Committee merely set policy and ensured that people were in place to comply with the established policy. The decisions on specific waste disposal practices were made by employees hired for the purpose of handling these responsibilities.

In turning to each Tiscornia individually, it is undisputed that Lester Tiscornia became a director of the Company in 1951, Executive Vice President of Manufacturing in 1961, and President and Chairman of the Board in 1964. According to the defendants, Lester served in an executive capacity and never directed the actual operation of the Company. Lester Tiscornia testified in deposition that his knowledge of environmental matters was limited to information presented in Executive Committee meetings. He semi-retired in 1975, although he continued to serve on the Executive Committee.

After Lester became less active in AUSCO, James Tiscornia acted as Chief Operations Officer until 1986. In this capacity, he oversaw four plants, including the two which are the subject of this action. Plant managers were in place at each site, however, as were employees responsible for environmental concerns. According to the organizational chart, three levels of supervision separated James Tiscornia from the environmental employees.

Edward Tiscornia served as Division Manager of St. Joseph and Manager of the Castings Division during the 1970s. He reported directly to the Plant Manager. In 1979, Edward moved into sales and remained sales manager until 1986.

In the late 1970s and early 1980s, during the Tiscornias' tenure, baghouse dust was disposed in the landfill. The results of a leachate test performed in 1981 on baghouse collector dust samples of wastes from St. Joseph and Riverside indicate that some samples exceeded drinking water standards for cadmium and lead.

## STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (quoting *United States v. Riebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). The movant meets its initial burden "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). At that point, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c).

## ANALYSIS

 CERCLA liability attaches if all of the following elements are established:

(1) There is a release or threatened release of a hazardous substance;

(2) at a facility

(3) causing the plaintiff to incur response costs; and

3. Exhibit 436 contains the minutes of a meeting held 11–20–78, see paragraph 7; exhibit 437 contains the minutes of a meeting held 11–27–78 and mentions a Riverside Consent Order, EPA notice of violations and the St. Joseph Water Discharge Permit–Non–Compliance Notice. Similar matters are included in the minutes contained in Exhibits 439 and 441.

**1320**

(4) the defendant is a responsible party as defined in § 107(a).

42 U.S.C. § 9607(a). *United States v. Aceta Agricultural & Chemical Corp.*, 872 F.2d 1373 (8th Cir.1989). Liability is strict, and fault or state of mind is irrelevant. *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988). Because the goals of CERCLA are remedial, the Court is obligated to construe the statute's liability provision broadly to avoid frustrating its legislative purpose. *Anspec Co., Inc. v. Johnson Controls*, 922 F.2d 1240, 1247 (6th Cir.1991).

**I**

In this motion, the Court must decide two issues, whether there was a release or threatened release of a hazardous substance, and whether the defendants are responsible parties.[4] In turning to the first element, the statute merely requires that there be a release or threatened release of a "hazardous substance" from the site. A hazardous substance includes substances designated as hazardous or toxic in specified environmental statutes or by the EPA pursuant to CERCLA § 102, 42 U.S.C. § 9602, and is defined as:

> (A) any substance designated pursuant to section 132(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921], [also known as the Resource Conservation and Recover Act ("RCRA") ] (but

not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901, *et seq.*] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clear Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15 ...

42 U.S.C. § 9601(14).[5] Counsel for the Tiscornias conceded in oral argument that baghouse dust is a hazardous waste as that term is defined by RCRA.[6] Further, it is undisputed that baghouse dust was deposited in the landfills until 1981. Nevertheless, each of the Tiscornia defendants contends that no landfill disposal of any hazardous substance occurred during his tenure on the Executive Committee.[7] This assertion is apparently based upon their argument that at the time the disposal occurred, the substances disposed of were not deemed hazardous.

CERCLA not only places liability on parties for antecedent acts, but also attaches new legal significance to them. The statute does not recognize compliance with state regulations as a valid defense. *B.F. Goodrich Co. v. Murtha*, 754 F.Supp. 960, 972 (D.Conn.1991). Under § 9607(b), the only defenses are "acts of God, acts of war, [sic] and acts or omissions of third parties." *J.V. Peters & Co., Inc. v. Administrator, Environmental Protection Agency*, 767 F.2d 263 (6th Cir.1985). Consequently, the defendants' contention that they acted responsibly

---

**4.** The parties do not dispute that AUSCO qualified as a facility or that the plaintiffs incurred response costs.

**5.** The definition of "hazardous substance" under MERA includes not only those substances deemed hazardous under CERCLA, but also hazardous waste as defined under the Michigan Hazardous Waste Management Act ("HWMA"), 1970 P.A. 64, as amended, M.C.L.A. § 299.501 *et seq.*, and "petroleum." See M.C.L.A. § 299.-603(p).

**6.** James Tiscornia admitted that foundry sand, metal shavings, dried paint residues, spent paint solvents, used oils, baghouse dust, general plant refuse and asbestos brake linings were deposited

in the landfills (interrogatory # 8), however, the parties did not discuss whether these additional substances meet the definition of hazardous under the Act.

**7.** The timing of the release is no consequence to the Court's analysis under the first element. In fact, the timing becomes pertinent when analyzing the second disputed element, whether any one of the Tiscornias was a responsible party. To find that a person is a responsible party, he must have owned or operated a facility *at the time of the disposal.* 42 U.S.C. § 9607(a)(2). Because the parties incorporated the timing of the disposal into their argument as to whether a release occurred, the Court, as a matter of convenience, likewise notes it here.

and complied with all laws does not immunize them from liability. See, *United States v. Dickerson,* 640 F.Supp. 448, 451 (D.Md.1986).

■ Accordingly, the defendants having admitted that the substances deposited in the landfill meet the definition of hazardous waste under RCRA, the Court finds that the plaintiffs have met their burden under the statute to show that a release or threatened release occurred at an AUSCO site.

## II

The Court now turns to the second element in dispute, whether each of the Tiscornias is a responsible party. Under 42 U.S.C. § 9607(a)(2) a responsible party is defined as:

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
. . .

Further, under the Act an owner or operator is defined as "any person" and any person is defined as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20)(A) and (21). The list makes no mention of corporate officers.

The plaintiffs allege in their motion that the Tiscornia defendants nevertheless are operators, and therefore responsible parties under CERCLA based upon their control over AUSCO. Because corporate officers are not listed as persons under the statute, the Court has reviewed three sources of authority to discover the basis upon which liability might be imposed upon a corporate officer: Sixth Circuit caselaw interpreting the CERCLA statute, Michigan corporate law, and various tests adopted in other circuits. Each is discussed below.

## A. Sixth Circuit Caselaw

The Sixth Circuit addressed the issue of the liability of corporate officers in *Donahey v. Bogle,* 987 F.2d 1250 (6th Cir.), wherein it reversed the finding of the district court that defendant Livingstone, the sole shareholder and director of defendant corporation St. Clair Company, was not liable for clean-up costs under CERCLA. The district court found that although Livingstone had the authority to control disposal practices, there was no testimony to indicate that Livingstone personally participated in waste disposal practices.

■ The Sixth Circuit opinion succinctly stated that the trial court erred in:

concluding that Seabourne Livingstone was not liable as an *owner* under CERCLA. The evidence clearly established that Livingstone had the authority to prevent the contamination of the property by his corporation; thus, as a matter of law, Livingstone was a responsible party. *Kelley v. Thomas Solvent Co.,* 727 F.Supp. 1532 (W.D.Mich.1989); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir.1985); *U.S. v. Ward,* 618 F.Supp. 884 (E.D.N.C. 1985); and *U.S. v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726 (8th Cir.1986). (Emphasis added).

Apparently, the dispositive factor in holding Livingstone liable as an owner was his status as sole shareholder and director of the corporation. To find *Donahey* controlling in this case, the Court would have to merge the three Tiscornia defendants into a single person and ignore the existence of other shareholders. Lester, James and Edward Tiscornia shared little beyond the same last name with respect to their corporate responsibilities. They each had a job to do and there has been no showing that any one of them performed his responsibilities only with the consensus of the others. Accordingly, the Court must examine the liability of these defendants based on their status as "operators."

Although the complaint alleged that the Tiscornias were owners or operators, the motions before the Court are apparently brought on the theory that, as a matter of law, the Tiscornias were operators. Because this Court is unable to discern any additional guidance from the holding in *Donahey,*[8] the

---

8. The cases cited by the court stand for differing

principles. In *Thomas Solvent,* the court ac-

Court gleans a framework in which to approach the issue of corporate officer liability based on operator status from the analysis in *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240 (6th Cir.1991). In *Anspec*, the court held that corporate successor liability existed under CERCLA because when Congress included the term corporation in the definition of persons who may be held liable under CERCLA, it intended that the term be given its universally accepted meaning.

The court reasoned that § 9607(a) was "textually incomplete" because it failed to specify that a reference to liability of corporations included successor corporations. *Id.*, at 1246. This interpretation of the statute merely recognized a universally accepted rule of law, the doctrine of successor corporate liability. Consequently, successor corporations were included.[9]

In reaching this conclusion, the Sixth Circuit also relied on the general rules of construction of the United States Code, and the legislative purpose of the Act. Specifically, 1 U.S.C. § 5 (1990), provides that the words "company" or "association" used in reference to a corporation include successors or assigns. An association is included in the list of business entities enumerated as potentially responsible parties ("PRPs") under CERCLA. Thus, successor corporations might be liable under CERCLA. The Sixth Circuit determined that the law of the state of incorporation would be applied to determine actual corporate successor liability under CERCLA. *Id.* at 1248.[10]

From a policy standpoint, the court's finding of successor liability was harmonious with the legislative purpose of CERCLA to provide "the federal government with the tools immediately necessary for a swift and effective response to hazardous waste sites" and "that those responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created." *Anspec*, at 1247.

■ Although the general rules of construction offer no guidance with regard to corporate officer liability, the Court finds that corporate officers, like successor corporations, may nevertheless be liable under CERCLA. In reaching this conclusion, the Court finds that holding accountable those persons, including corporate officers, respon-

knowledged that the standard it adopted was "unlike the lack of corporate formalities associated with piercing the corporate veil, and ... different from the issue of personal knowledge, direct supervision, or active participation found in most ordinary torts by corporate actors." *Id.* at 1544. Thus, liability turned on the actor's ability to prevent the discharge. Under *Shore Realty*, the liability turned on the actor's own participation and involvement in the discharge. *Ward* addressed the liability of an actor who "arranged for disposal" pursuant to § 107(a)(3), and the facts established he was personally involved. *Id.* at 896. Finally, *Northeastern Pharmaceutical* involved a corporate actor's liability as a generator under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* RCRA regulates the storage, handling and disposition of hazardous wastes. *Id.* at 726. The court's citation to these incongruous line of cases provides no thread of reasoning through which this Court is able to discern the standard by which a corporate officer is liable under CERCLA as an operator.

9. See, also, *CPC Intern., Inc. v. Aerojet–General Corp.*, 777 F.Supp. 549, 573 (W.D.Mich.1991), a case wherein the court concluded that CERCLA broadens "the potential for liability of parent corporations without discarding entirely the traditional concept of limited liability that is central to corporate law. By expressly including as liable parties those that have 'operated' facilities, Congress unmistakably expanded the reach of CERCLA beyond the limited realm of those who have 'owned sites'." But the statute and its legislative history do not suggest that CERCLA rejects entirely the crucial limits to liability that are inherent to corporate law. The court concluded that CERCLA's owned or operated language demands that a parent must have actually operated the business of a subsidiary, and that mere oversight of the business in a manner appropriate and consistent with the investment relationship is not enough.

10. This Court also reviewed *United States v. Production Plated Plastics, Inc.*, 742 F.Supp. 956 (W.D.Mich.1990), *aff'd* 955 F.2d 45 (1991), wherein the court held that corporate officer liability under the Resource Conservation & Recovery Act ("RCRA"), 42 U.S.C. § 6973(a), could be established if the officer "actually made corporate decisions." The language of the statute authorizes this outcome. 42 U.S.C. § 6973(a) provides for the imposition of liability against "any person (including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility) ... provided that person has contributed or "is contributing to such handling, storage, treatment ..."

sible for creating the harm, is consistent with both the purpose for which Congress enacted CERCLA, and cases interpreting CERCLA by the Sixth Circuit. Corporate officer liability, like corporate successor liability, is a long-standing and universal doctrine of law which is not to be ignored. Hence, the statute is construed in light of "universally accepted principles of private corporation law." *Anspec*, at 1245. Accordingly, the Court next addresses the applicability of the law of the state of incorporation.

## B. Michigan Corporate Law

In turning to state corporate law, the Court notes that one well-established basis for imposing liability on a corporate officer is his participation in tortious or criminal acts whether on his own behalf or on behalf of the corporation. *Attorney General v. Ankersen*, 148 Mich.App. 524, 557, 385 N.W.2d 658 (1986) (citations omitted).[11]

The plaintiffs argue that to impose liability, Michigan law requires only that a corporate officer had knowledge of the existence or continuance of a nuisance created or maintained by the corporation or should have known through the exercise of ordinary diligence. *Kelley v. Acme Disposal*, 189 Mich. App. 722, 726, 473 N.W.2d 824 (1991). In *Acme Disposal*, the court found that a party with the power to control corporate activities due to his position or ownership interest may be liable for a nuisance created or maintained by the corporation. In reaching this conclusion, the court relied upon *McSwain v. Redford Twp.*, 173 Mich.App. 492, 499, 434 N.W.2d 171 (1988). This Court finds that *McSwain* is distinguishable, however, both factually and legally. *McSwain* addressed township liability to landowners for failure to install a sewer system, not corporate officer liability. Further, it was decided based upon the law of nuisances, not corporate law. *Id.*, citing 58 Am.Jur.2d, Nuisances, § 49, p. 616.

Where the state supreme court has not spoken, the federal court must discern how that court would respond if confronted with an issue. *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985). The Court is not free to disregard the opinion of an intermediate state court unless it is convinced the highest court would decide otherwise. *FL Aerospace v. Aetna Casualty & Sur. Co.*, 897 F.2d 214, 218 (6th Cir.), *cert. denied* 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). The state court's reliance on *McSwain* as support for the decision in *Acme Disposal* is clearly misplaced. Accordingly, this Court is not persuaded that the Michigan Supreme Court would adopt the reasoning advocated in *Acme Disposal*. Plaintiffs' reliance upon it to hold the defendants responsible because of their positions as corporate officers, therefore, is misplaced.

## C. Standards of Liability Adopted by Other Circuits

Guided by the principles discerned from the law of this circuit and state corporate law, the Court has reviewed the alternatives adopted by other courts to determine whether corporate officers are liable as responsible persons under CERCLA. Apparently, four separate standards for liability have been employed: (1) piercing the corporate veil; (2) the capacity or authority to control corporate conduct; (3) the prevention test; and (4) direct control over or participation in wrongful conduct.

### 1. Piercing the Corporate Veil

The Fifth Circuit has adopted the first alternative, piercing the corporate veil, in assessing corporate successor liability. Under traditional corporate law, piercing the corporate veil requires a showing that officers or directors have violated corporate formalities or breached fiduciary duties. In *Joslyn Corp. v. T.L. James & Co.*, 696 F.Supp. 222, 224–45 (W.D.La.1988), *aff'd*, 893

---

11. Michigan law also provides a second basis upon which corporate officer and, consequently, CERCLA liability may be based. Under Michigan law, piercing the corporate veil is an equitable doctrine applied to prevent fraud, illegality or injustice, and may be used to impose liability on a corporate officer. *Schusterman v. Employment* *Security Comm'n*, 336 Mich. 246, 57 N.W.2d 869 (1953); *Soloman v. Western Hill Dev. Co.*, 110 Mich.App. 257, 312 N.W.2d 428 (1981). This doctrine is not applicable to the facts of this case and neither party has advocated this doctrine as a means by which the Court could determine the existence of liability.

**1324**

F.2d 80 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991), the court in dicta rejected the analyses of courts that held officers liable for clean up cost without first piercing the corporate veil because "they have chosen to ignore the corporate form without an express congressional directive" to do so. *Id.* at 83.

In the opinion of this Court, this test of derivative liability ignores other avenues of corporate law through which liability may be imposed. The Fifth Circuit addressed the issue again in *Riverside Mkt. Dev. Corp. v. Int'l Bldg. Products, Inc.,* 931 F.2d 327 (5th Cir.1991), and reached a different conclusion as to operator status. Although piercing the corporate veil continued to be the standard for imposing liability on a corporate officer as an owner, direct participation in the improper disposal was the key to imposing liability on the corporate officer as an operator. *Id.* at 330.

### 2. Capacity or Authority to Control Corporate Conduct

Under the capacity or authority to control corporate operations test, liability attaches if the individual could have controlled the activity. Direct participation is not necessary. In *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726 (8th Cir.1986), the president and major shareholder of Northeastern was found liable as a generator under the RCRA. *Id.* at 745. This decision also addressed the liability of a plant supervisor as an "arranger" of disposal of hazardous substances under § 107(a)(3). Because the manager actually participated in illegal conduct, liability was imposed. Accordingly, the case is of limited value in assessing liability pursuant to § 107(a)(2), and this Court declines to apply the analysis under RCRA or § 107(a)(3) to the facts presented here.

### 3. The Prevention Test

Under the prevention test, the court reviews evidence of an individual's authority to control waste handling practices, including distribution of power in the corporation, percentage of shares owned, responsibility for waste disposal practices and neglect in that regard. *Kelley v. ARCO Industries Corp.,* 723 F.Supp. 1214, 1219–1220 (W.D.Mich.1989). This test was adopted by a district court in Illinois, *Quadion Corp. v. Mache,* 738 F.Supp. 270 (N.D.Ill.1990). In the opinion of this Court, this test results in expanded liability based on a corporate officer's position, a formulation which ignores basic principals of corporate law. Power or authority is not a relevant factor in determining liability of a corporate officer for tortious conduct. For this reason the Court declines to adopt this test.

### 4. Direct Control or Participation

In *New York v. Shore Realty,* 759 F.2d 1032 (2nd Cir.1985), the court adopted the direct control or participation test. In that case, liability was imposed on the principal officer and shareholder as an operator under CERCLA where the corporation purchased contaminated property but did not dispose of any hazardous substance. The officer knew that hazardous waste was stored on the property which was operated illegally as a waste storage facility, yet continued to allow new waste to be stored at the site. The court noted that the definition of owner or operator "excluded a person, who, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect his security interest in the facility." *Id.* at 1052. The court concluded from that definition that the exclusion implied that a stockholder who managed the corporation may be liable under CERCLA as an operator. *Id.*

After reviewing related caselaw from the Sixth Circuit, Michigan corporate law, and the various tests employed by other circuits, the Court finds that the direct control or participation test, which holds individuals accountable for their own tortious acts, is the appropriate standard to be used in assessing operator liability. This standard recognizes that the statute includes as responsible parties those that may be found liable under traditional corporate law principles.

Using this standard, the Court must decide whether, as a matter of law, the Tiscornia defendants participated actively in the

waste handling practices at AUSCO, especially in the disposal of baghouse dust. Active participation is not limited to actual disposal, but extends to decisionmaking and supervision such that an officer could be considered an active individual participant in the unlawful conduct.

The plaintiffs argue that prior to 1986, there is no genuine issue of material fact that the Tiscornia defendants ran AUSCO, made final decisions regarding environmental issues and are clearly liable under traditional common law corporate and tort principles.[12] The evidence upon which the plaintiffs rely in support of its motion includes: the Executive Committee meetings including the discussions of environmental matters, the use of on-site landfills from 1979 through 1981; and the exceedances on the water discharge permits.

It is clear from the documents cited to the Court that environmental issues were discussed at 111 of 435 meetings of the Executive Committee. Nevertheless, the defendants contend that Lester, James and Edward Tiscornia, as members of the Executive Committee, did not directly handle the day-to-day waste management. As members of the Executive Committee, however, they did establish policies of environmental compliance, which were then carried out by four AUSCO employees. Richard Lee acted as plant manager for the St. Joseph and Riverside facilities from 1968 through 1985. Fred Preston, a metallurgical engineer, headed materials engineering. Preston testified that he was unaware of a single instance when cost determined the corporate response to an environmental concern. Gerald Sanders worked as a maintenance electrician and handled environmental compliance of the PCB transformers. Bruce Ladewski worked as a water quality technician.

The DNR dealt with these employees, not the Tiscornia defendants. Only one DNR employee ever had direct contact with any of the Tiscornia defendants. Charles Bikfalvy

met James Tiscornia at one of the plants. Bikfalvy stated in his deposition that the two discussed hazardous waste and compliance, however, this contact did not leave Bikfalvy with the impression that James Tiscornia ever approved of a waste violation.

This evidence, relied upon by both parties, lends itself to inferences favoring both parties. The number of meetings in which environmental matters were discussed creates an inference that the Tiscornia defendants were not only aware of these matters, but somehow actively involved in them. The Tiscornias, however, stated that they confined their involvement to policymaking. The Tiscornias did hire specialists to manage disposal matters, an action which supports their characterization. The content of discussions of environmental issues has been summarized to the point of sanitization. No inferences flow from the notes themselves. The apparent meaning of several memos sent to the Executive Committee or its members has been put into doubt through the deposition testimony and affidavits of their authors. The credibility of each of the defendants and the employees who were intimately involved in waste disposal appear to be crucial to the resolution of this litigation. Because the evidence as now presented is subject to conflicting interpretations and credibility determinations must be made, summary judgment is improper.

In accordance with the opinion rendered above, this Court finds that defendant's motion for summary judgment is **DENIED** and plaintiffs' motion for partial summary judgment as to the liability of each of the Tiscornia defendants is also **DENIED.**

**IT IS SO ORDERED.**

12. Apparently, this argument is based on the fact that the Tiscornias did not follow the suggestions of their employees and that they continued to dump in the landfills even though they had no permit. A memorandum written by Fred Preston, a metallurgical engineer, advocates compliance with permits and discusses alternative solutions to dealing with exceedances. The meaning of this memo is open to differing interpretations.